IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GREYS AVENUE PARTNERS, LLC, et al.,<br><br>            Plaintiffs,<br><br>    vs.<br><br>COLIN THEYERS, et al.,<br><br>            Defendants. | CIVIL NO. 19-00079 JAO-KJM<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

In their First Amended Complaint, Plaintiffs Greys Avenue Partners, LLC and Castle Resorts & Hotels, Inc. (collectively, "Plaintiffs") bring claims against Defendant Colin Theyers ("Defendant Theyers" or "Defendant") for misrepresentation, fraud, conversion, violations of state and federal securities laws, and violation of the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* ECF No. 9 ("FAC"). Defendant Theyers moves to dismiss the FAC under Federal Rule of Civil Procedure ("FRCP") 12 on the grounds that personal jurisdiction is lacking, venue is improper, and Plaintiffs failed to state certain claims. *See* ECF No. 13. For the reasons stated below, Defendant Theyers' motion is denied.

# I.    BACKGROUND

## A.    Facts[1]

This action arises from a series of agreements among various parties related to a joint venture to convert an office building in New Zealand into a hotel. *See generally* FAC. Greys Avenue Investments Limited ("GAIL") owns the relevant property in New Zealand (the "Property"). FAC ¶ 11. Aaron Coupe is the sole shareholder of GAIL and Defendant Theyers is its director and manager. *Id.* ¶¶ 8-10. Defendant and Mr. Coupe are citizens of New Zealand. *Id.* ¶ 4; ECF No. 13-1 at 16.

GAIL solicited Plaintiff Castle Resorts & Hotels, Inc. ("Castle") to become involved in the project to convert the Property into a hotel. ECF No. 17-3 ("Mattson Decl.") ¶ 3. Castle is a Hawai'i corporation with its principal place of business in Honolulu. FAC ¶ 2. Richard Wall, Gary Oda, and Jerry Ruthruff are

---

[1] Where, as here, facts are relevant to the personal jurisdiction analysis, the Court will look beyond the allegations in the FAC to the evidence the parties submitted. *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002). To the extent the parties' declarations raise a dispute, "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citations omitted). For purposes of Defendant's motion under Rule 12(b)(6), however, the Court considers and accepts as true only those factual allegations contained in the FAC.

all affiliated with Castle and were or are residents of Hawaiʻi.[2]  ECF No. 17-2 ("Oda Decl.") ¶ 2; Supp. Theyers Decl. ¶¶ 3-4, 16; FAC ¶ 1.  Castle also has a sister company in New Zealand—NZ Castle Resorts & Hotels, Inc. ("NZ Castle")—that was involved in the venture as the planned operator of the hotel after it opened.  Mattson Decl. ¶ 12.  Plaintiff Greys Avenue Partners, LLC ("GAP") is also affiliated with Castle, as Mr. Oda is GAP's sole member.  FAC ¶ 1; Oda Decl. ¶ 2; Supp. Theyers Decl. ¶ 12.

Defendant first began negotiating with Castle in conjunction with this venture in early November of 2017.  ECF No. 13-2 ("Theyers Decl.") ¶ 5.  He first met certain Castle representatives, namely Mr. Wall, Mr. Oda, and Mr. Ruthruff, in New Zealand in late November 2017.  Supp. Theyers Decl. ¶ 3.  During their trip to New Zealand, the Castle representatives engaged in detailed discussions with Defendant and Mr. Coupe regarding the conversion of the Property, including by reviewing an appraisal of the Property, reviewing income projections, addressing GAIL's existing debt levels, and conducting a site visit.  *See id.* ¶¶ 4–12.  During this trip, the parties also negotiated certain terms regarding transferring the Property to a joint venture entity, Castle financing the necessary construction, the division of profits, and the assumption of GAIL's existing debts.  *Id.* ¶¶ 12–14.

---

[2]  Mr. Wall passed away in May 2018.  ECF No. 18-1 ("Supp. Theyers Decl.") ¶ 26.

Defendant memorialized these terms in a preliminary Heads of Agreement ("Preliminary HOA"), which was provided to the Castle representatives while in New Zealand before they returned to Hawaiʻi. *Id.* ¶ 15. Each side retained a New Zealand firm to review the Preliminary HOA. *Id.* ¶ 16.

In December 2017, Defendant instructed GAIL's attorneys to prepare additional documents related to the parties' deal, including a shareholder's agreement for the joint venture entity—a New Zealand entity, Ascent Industries 33 Limited ("Ascent")—that would hold the parties' interests. *Id.* ¶ 17; Theyers Decl. ¶ 2. Both sides also conducted due diligence, and continued to negotiate the HOA and corporate documents for Ascent. Supp. Theyers Decl. ¶ 19. In January 2018, Defendant provided Mr. Ruthruff with GAIL's updated balance sheet and addressed his questions regarding which assets and liabilities Ascent would assume. *Id.* ¶ 19. Defendant represented that the amount owed on GAIL's loan from the Bank of New Zealand secured by a mortgage on the Property was around $4.8 million, and that GAIL had other loans from the Bank of New Zealand totaling around $4 million that Mr. Coupe (who had assets outside GAIL's ownership secured in the Bank's favor) would retain. ECF No. 17-1 (Ex. 2).

Defendant and Mr. Coupe agreed to travel to Honolulu in February 2018 to execute the final documents. Supp. Theyers Decl. ¶¶ 20–23; *see also* Oda Decl. ¶ 7 ("Mr. Theyers came to Honolulu to attempt to close the deal between GAIL and

GAP"). Between November 2017 and February 2018, Mr. Oda authorized GAP's attorneys to negotiate the terms of a proposed deal with GAIL. Oda Decl. ¶ 5.[3] Prior to the February 2018 meeting in Honolulu, GAP was under no obligation to invest in the Property with GAIL. *Id.* ¶ 6. One day before Defendant met with Plaintiffs in Honolulu, Mr. Ruthruff sent Defendant a revised version of the HOA, which stated in relevant part: "GAIL shall forthwith contribute the Property to Ascent subject only to the current debt of approximately $14,833,195.73 payable to [Bank of New Zealand], $899,642.68 payable to Summer Blue and Loan No. 1 of $47,000." ECF No. 18-9 ¶ 8.

At the meeting at Castle's office in Honolulu in February 2018, Defendant and Mr. Oda discussed the terms of the deal. Oda Decl. ¶¶ 10–15. Mr. Oda asked whether the amount of GAIL's indebtedness that Ascent would assume could be reduced below $16.2 million, in light of the documentation Defendant sent Mr. Ruthruff indicating that the amount owed on a loan from the Bank of New Zealand and secured by the Property was only around $14.8 million. *Id.* ¶¶ 10–11. Defendant responded that this reduction was not possible because of the $14.8 million owed to the Bank of New Zealand and $900,000 owed to a tenant of the Property. *Id.* ¶ 12. Mr. Oda also asked when title to the Property could be

---

[3] It is unclear when negotiations between GAIL and Castle transitioned to include GAP.

transferred to Ascent, and Defendant responded that title would be transferred as soon as a shareholder's agreement was finalized. *Id.* ¶¶ 13–14; *see also* Mattson Decl. ¶¶ 4–9. Satisfied with this information, Mr. Oda signed the HOA on behalf of GAP and Defendant signed the HOA on behalf of GAIL. Oda Decl. ¶ 15. The executed HOA provides in relevant part that "GAIL shall forthwith contribute the Property to Ascent subject only to the current debts in an amount not exceeding $16.2 million." ECF No. 13-3 ¶ 8. Per the terms of the HOA, GAP was required to contribute $4 million to Ascent, $500,000 of which was to be contributed upon execution of the HOA. *Id.* ¶ 9.

In May 2018, GAIL, GAP, and Ascent executed the Shareholder's Agreement ("SHA") that provided, among other things, that shares in Ascent would be split equally between GAIL and GAP and that Defendant and Mr. Oda would serve as Ascent's Directors. ECF No. 15. At another meeting at Castle's office in Honolulu in June 2018, Defendant delivered the stock certificate selling GAP its portion of Ascent's shares—50 shares for $1.00 per share—which Mr. Oda executed on behalf of GAP in the presence of a witness. Oda Decl. ¶ 17; ECF No. 17-1 (Ex. 5). That same day, Defendant held the sole Board of Directors' meeting for Ascent at Castle's office in Honolulu, the minutes of which reflect that Defendant called the meeting to order, the parties executed the share transfer, and Defendant noted for the record that the previously executed SHA was formally

adopted.  Oda Decl. ¶ 18; ECF No. 17-1 (Ex. 6); *see also* Supp. Theyers Decl. ¶ 29.  At this meeting, Defendant also provided updates on the financial analysis of the venture and accounting for the joint venture.  ECF No. 17-1 (Ex. 6).

Plaintiffs later learned the Property was subject to a mortgage indebtedness of $18.7 million (not $14.8 million as Defendant represented) and that GAIL could not transfer title to the Property without repaying or refinancing this mortgage and because a current tenant had a right of first refusal.  *See* FAC ¶ 17.  GAP would not have entered into the HOA if it had known these facts.  Oda Decl. ¶¶ 16, 19–21; FAC ¶¶ 15–20, 26–27.  Castle similarly alleges it relied on Defendant's representations at the February 2018 Honolulu meeting when agreeing to incur and in fact incurring substantial expenses in performing "pre-opening services" aimed at the conversion of the Property into a hotel.[4]  Mattson Decl. ¶¶ 12–14, 16–17; FAC ¶¶ 15–20, 26–27.  Castle would not have been willing to or have incurred these obligations and expenses had it known these facts.  *See* Mattson Decl. ¶¶ 12–14, 16–17; FAC ¶¶ 15–20, 26–27.

Pursuant to the agreements discussed above, GAP alleges it expended $2.9 million and Castle alleges it incurred expenses and expended services totaling over

---

[4]  Pursuant to a Hotel Management Agreement ("HMA") between Ascent and Castle's sister entity, NZ Castle, NZ Castle would manage the hotel operations. *See* ECF No. 13-6.  But because NZ Castle lacked the resources needed to open the hotel, Castle was responsible for performing "pre-opening services."  Mattson Decl. ¶¶ 12–17.

$250,000.  FAC ¶¶ 19–20, 26–27.  Aside from misrepresentations about the mortgage on the Property and GAIL's ability to transfer the Property to Ascent, Plaintiffs allege that Defendant engaged in other misrepresentations that they relied on in agreeing to the venture.  FAC ¶¶ 15–20, 35, 39.  These misrepresentations include that: GAP's contribution of $4 million would be sufficient to convert the Property into a hotel (when it was not); that GAP's contributions would be deposited into an account that required both sides' signatures and would only be used to convert the Property into a hotel (when they were not); and that Defendant would maintain complete accounting records and provide GAP with real-time access to accounting records so that GAP would have detailed knowledge of the project's finances at all times (when he did not).  *See* FAC ¶¶ 15–20, 35, 39.  Because of Defendant's conduct, Ascent was unable to refinance the Property, the conversion to a hotel failed, and Plaintiffs' investments lost significant value.  *See id.* ¶¶ 21–22, 37, 40.

## B.    Procedural History

Plaintiffs initially filed a Complaint against Defendant and Mr. Coupe.  ECF No. 1.  Plaintiffs voluntarily dismissed all claims against Mr. Coupe, ECF No. 5, and then filed the FAC against Defendant and GAIL.  ECF No. 9.  Plaintiffs indicate they will dismiss all claims against GAIL, although they have not yet formally done so.  ECF No. 17 at 2–3, 23.  Plaintiffs bring claims against

Defendant for misrepresentation, fraud, conversion, federal and state securities law violations, and a civil RICO violation.  ECF No. 9.  After Plaintiffs filed the FAC but before Defendant moved to dismiss the FAC, Mr. Coupe filed a Statement of Claim in New Zealand court against Plaintiffs and the individuals affiliated with Plaintiffs.  ECF No. 13-7.

Defendant moved to dismiss the FAC arguing he is not subject to the jurisdiction of Hawaiʻi courts, that venue in Hawaiʻi is improper, and that Plaintiffs failed to state certain claims.  ECF No. 13.  Plaintiffs oppose the motion.  ECF No. 17.[5]  The Court held a hearing on Defendant's motion on December 20, 2019.

## II.    DISCUSSION

### A.    Defendant's Motion to Dismiss under Rule 12(b)(2)

Defendant first moves to dismiss the FAC under Rule 12(b)(2) on the basis that the Court lacks jurisdiction over him as a nonresident defendant.

#### 1.    Legal Standard under Rule 12(b)(2)

A plaintiff bears the burden of establishing personal jurisdiction over a nonresident defendant.  *See Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010); *Schwarzenegger*, 374 F.3d at 800.  When no federal statute

---

[5]  As the Court indicated at the hearing, it will deem Plaintiffs' opposition timely.

governs personal jurisdiction,[6] the district court applies the law of the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Hawaii's jurisdiction reaches the limits of due process set by the United States Constitution. *See Cowan v. First Ins. Co. of Haw.*, 61 Haw. 644, 649, 608 P.2d 394, 399 (1980) (stating that Hawai'i's long-arm statute, Hawai'i Revised Statutes ("HRS") § 634-35,[7] was adopted to expand the jurisdiction of Hawai'i courts to the extent permitted by the due process clause of the Fourteenth Amendment). Constitutional due process requires that a defendant "have certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).

There are two categories of personal jurisdiction: (1) general jurisdiction and (2) specific jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*,

---

[6] Neither party contends that a federal statute governs personal jurisdiction here. The Court notes, however, that Plaintiffs bring claims under federal statutes that provide for nationwide service of process under which the relevant question becomes whether a defendant has sufficient contacts with the United States—not any particular state. *See, e.g.*, 15 U.S.C. § 78aa; *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). Because the parties do not address this issue, and instead discuss only Defendant's contacts with Hawai'i, the Court does the same.

[7] HRS section 634-35 provides that a nonresident who transacts business in Hawai'i or commits a tortious act within Hawai'i thereby submits to the jurisdiction of courts in Hawai'i for a cause of action arising out of such conduct. *See* HRS § 634-35(a).

466 U.S. 408, 413–15 (1984).  Plaintiffs do not contend that the allegations in the

FAC support the exercise of general jurisdiction, so the Court addresses only

specific jurisdiction.

As to specific jurisdiction, courts generally conduct a three-part inquiry—

commonly referred to as the minimum contacts test—to determine whether a

defendant has sufficient contacts with the forum to warrant the court's exercise of

jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (citation omitted).  The minimum contacts test

"ensures that a defendant will not be haled into a jurisdiction solely as a result of

random, fortuitous, or attenuated contacts."  *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 475 (1985) (internal quotation marks and citations omitted).  Applying

the minimum contacts test, the Court concludes that it has specific jurisdiction over

Defendant.

### 2.     Defendant's Minimum Contacts with Hawai'i

Although the FAC raises various claims, Plaintiffs' opposition clarifies that, as to Defendant, they assert only tort and securities claims—not any contract claims.  ECF No. 17 at 16.  For claims sounding in tort, courts look to whether the defendant committed a purposeful act *within* the forum state, but also apply a "purposeful direction" test for conduct that takes place *outside* the forum state that has effects inside the forum state.  *See Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 603–06 (9th Cir. 2018).  Because Plaintiffs also bring securities fraud claims, minimum contacts may also be established based on purposeful availment.  *See  SEC v. Ficeto*, No. CV 11–1637–GHK (RZx), 2013 WL 1196356, at *4 (C.D. Cal. Feb. 7, 2013) ("The fraud aspects of a securities case may establish purposeful direction, as in a tort case, while the transactional aspects of a securities case may establish purposeful availment.").[8]  A "purposeful availment" analysis asks whether Defendant purposefully availed himself of the privilege of conducting activities within Hawai'i, thus invoking the benefits and protections of its laws.  *See Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015).

---

[8]  Defendant raised a new argument in reply that Plaintiffs failed to state their securities fraud claims; however, the Court will not address new arguments raised for the first time in reply.  *See* LR7.2 ("Any argument raised for the first time in the reply shall be disregarded.").

### a. Tortious Conduct in Hawaiʻi and Purposeful Direction

The Court concludes it can exercise specific jurisdiction over Defendant for Plaintiffs' claims sounding in tort. Defendant's alleged tortious conduct here includes: making misrepresentations to Plaintiffs about the mortgage on the Property and transferability of the Property and inducing Plaintiffs' reliance on these statements (and traveling to Hawaiʻi to do so); delivering and executing an agreement at a Board of Directors meeting held in Hawaiʻi that formally transferred shares in Ascent to GAP in exchange for GAP's commitment to advance funds that Defendant promised to deposit in an account requiring GAP's signature and to use only to convert the Property into a hotel; and falsely promising to maintain an accounting of the joint venture and provide Plaintiffs full information on the status of the venture. *See, e.g.*, FAC ¶¶ 13, 15–20, 25–29, 35, 39.

This conduct demonstrates purposeful direction because Defendant not only intentionally targeted known Hawaiʻi residents whom he knew would be harmed in Hawaiʻi, but further, traveled to Hawaiʻi for the purpose of inducing Plaintiffs to enter into transactions and to promote the transaction of business, while also purporting to make long-term commitments to these Hawaiʻi residents. "Because Plaintiffs allege that Defendant[] committed the intentional tort . . . while present in the forum state, the first two prongs of the minimum contacts test are satisfied

here." *Freestream*, 905 F.3d at 603 (citation omitted); *see also id.* ("We [have] found that '[t]he inducement of reliance in California [was] a sufficient act within California to satisfy the requirement of minimum contacts where the cause of action [arose] out of that inducement.'" (quoting *Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.*, 757 F.2d 1058, 1064 (9th Cir. 1985))); *see also* HRS § 634-35(a)(1), (a)(2) (stating that a person submits to jurisdiction by transacting business in Hawaiʻi or committing tortious act in Hawaiʻi).[9]  Defendant's argument that merely entering into a contract with a forum resident is insufficient is thus misplaced given the scope of additional conduct alleged here.  *See* ECF No. 18 at 5–6.[10]

Defendant emphasizes that Plaintiffs invited him to travel to Hawaiʻi, Supp. Theyers Decl. ¶¶ 20–22, and that he traveled here again to attend Mr. Wall's

---

[9]  *See also Maeda v. Pinnacle Foods Inc.*, 390 F. Supp. 3d 1231, 1257–58 (D. Haw. 2019) (listing elements of negligent misrepresentation under Hawaiʻi law—which include defendant supplying false information and plaintiff's reliance upon the misrepresentation—and concluding that Rule 9's heightened pleading standard does *not* apply to such a claim).

[10]  Indeed, some of the cases Defendant cites suggest that evidence of a contract with a forum resident *can* demonstrate minimum contacts when considered alongside the defendant's other forum-related conduct.  *See Sher v. Johnson*, 911 F.2d 1357, 1362–63 (9th Cir. 1990) (concluding that California could exercise jurisdiction over plaintiff-client's suit against his Florida law firm arising out of its representation of him in Florida legal proceedings even though firm did not solicit business in California, because firm required plaintiff to execute deed of trust over California property for payment and in light of firm sending letters to and calling plaintiff in California and making trips to California for convenience of plaintiff).

14

funeral, *id.* ¶ 26, rendering Hawaiʻi a logistically convenient place to hold the Board of Directors' meeting, *id.* ¶¶ 27–29. But the Court must accept that it was GAIL who solicited Castle to join the conversion project. Mattson Decl. ¶ 3. Defendant also chose to accept the invitation and transact business while in Hawaiʻi on two separate occasions. Oda Decl., ¶¶ 6–18; Supp. Theyers Decl., ¶¶ 27–29. The Court must also accept at this stage that material misrepresentations occurred in Hawaiʻi—particularly regarding the indebtedness on and ability to transfer the Property—and that GAP executed the HOA in Hawaiʻi and Castle began providing services based on their reliance on Defendant's misrepresentations made during these discussions in Hawaiʻi. *See* Mattson Decl., ¶¶ 4–10, 15–17; Oda Decl., ¶¶ 6–18; *compare* ECF No. 18-9 (draft HOA that Mr. Ruthruff sent to Defendant on February 10, 2018), *with* ECF No. 13-3 (final HOA that Defendant and Mr. Oda executed on February 11, 2018). Nor does Defendant cite any authority that a court must disregard a defendant's presence in the forum if the plaintiff invited him there—and he voluntarily chose to accept this invitation. *See Freestream*, 905 F.3d at 606–07; *see also Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or

through an agent, goods, mail, or some other means—is certainly a relevant

contact." (citation omitted)).[11]

Defendant's reliance on *Walden* is also misplaced. "In that case, Nevada

plaintiffs sued an out-of-state defendant for conducting an allegedly unlawful

search of the plaintiffs while they were in Georgia preparing to board a plane

bound for Nevada." *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct.

1773, 1781–82 (2017). The Supreme Court held Nevada lacked specific

jurisdiction—even though plaintiffs were Nevada residents and suffered

foreseeable harm there—because the relevant conduct occurred entirely in Georgia

---

[11] The Ninth Circuit's discussion in *Freestream* regarding a defendant's travel to the forum state is instructive. In *Freestream*, the defendant voluntarily traveled to a conference in the forum state and, while there, made the alleged defamatory statements about the plaintiff that gave rise to the suit. *See* 905 F.3d at 607. The Ninth Circuit distinguished those facts from *Morrill v. Scott Financial Corp.*, 873 F.3d 1136 (9th Cir. 2017), where the defendants had first filed suit against plaintiffs in Nevada and, in connection with that suit were required to enter Arizona (where plaintiffs resided) under relevant rules of procedure to serve process and engage in discovery for the Nevada lawsuit. *See Freestream*, 905 F.3d at 606–07. The plaintiffs then filed suit against the defendants in Arizona alleging defendants engaged in abusive litigation tactics in Arizona in connection with the Nevada suit. *See id.* The Ninth Circuit concluded the defendants in *Morrill* were not subject to suit in Arizona "[b]ecause the Nevada litigation *required* the defendants to conduct activity in Arizona (where the plaintiffs happened to reside), and the defendants thus were not in the forum state of their own volition." *Id.* at 607 (citation omitted). This case is more analogous to *Freestream* than it is to *Morrill* because Defendant was under no obligation to travel to Hawaiʻi to secure an agreement and advance the parties' business venture, but nonetheless chose to do so.

and the defendant never "traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Walden*, 571 U.S. at 289.

While this may have been a closer case if Defendant's presence in Hawai'i was limited to phone, letter, or email communications directed at the forum and he had not traveled to Hawai'i, the Court concludes there is a meaningful distinction between *Walden* and the present dispute particularly because Defendant twice traveled to Hawai'i to make affirmative representations to Hawai'i residents, finalize transactions, and advance the process whereby Hawai'i residents provided him financial benefits. As alleged in the FAC, Defendant also purposefully reached out beyond New Zealand and into Hawai'i in a way that envisioned continuing and wide-reaching contacts in Hawai'i and, when he did not use Plaintiffs' funds for the promised purpose and did not keep Plaintiffs informed as promised, he affected Hawai'i residents. *See Walden*, 571 U.S. at 285. For all these reasons, Plaintiffs have demonstrated the requisite minimum contacts to exercise jurisdiction over their tort claims.

### b. Purposeful Availment

The Court also concludes it can exercise jurisdiction over Plaintiffs' securities claims based on evidence that Defendant purposefully availed himself of the benefits of conducting business in Hawai'i. Purposeful availment requires the defendant to "have 'performed some type of affirmative conduct which allows or

promotes the transaction of business within the forum state.'" *Picot*, 780 F.3d at 1212 (quoting *Sher*, 911 F.2d at 1362). Again, while a contract with a forum resident alone is insufficient, courts may examine the circumstances surrounding the contract, such as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* (quoting *Burger King*, 471 U.S. at 479).

As relevant to the securities claims here, Defendant traveled to Hawaiʻi to secure and finalize the HOA, then returned for the execution of the Ascent share transfer and to hold a meeting to formalize that transfer, and while in Hawaiʻi also engaged in other business advancing the parties' long-term investment relationship. *See* Oda Decl. ¶¶ 6–18; ECF No. 17-1 at 19–22 (Exs. 5, 6). Plaintiffs further allege that one component of that long-term relationship was that Defendant would protect their financial contributions and investments in certain ways and provide access to updated accounting information regarding the status of the joint venture. FAC ¶¶ 15–17, 35, 39. At the hearing, Defendant's counsel emphasized that there was no time limit on the joint venture. The Ninth Circuit has recognized that the "purposeful availment" requirement is satisfied if the defendant took deliberate action within the forum state or created continuing obligations to forum residents. *See CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004). Both exist here.

Defendant emphasizes that the relevant agreements were governed by New Zealand law, stated in New Zealand dollars, involved New Zealand entities, negotiated with the assistance of counsel in New Zealand, and centered on the development of property in New Zealand. These facts are certainly relevant; however, personal jurisdiction is not a zero-sum game. The question is whether pressing these claims in Hawaiʻi meets minimum constitutional requirements, not whether Hawaiʻi is the only forum, or even the ideal forum for the lawsuit. Here, the Court concludes it can exercise jurisdiction because Plaintiffs demonstrated the requisite contacts between Defendant and Hawaiʻi and that Plaintiffs' claims arise out of or relate to these contacts with Hawaiʻi, and Defendant has failed to set forth a compelling case that the exercise of jurisdiction would be unreasonable.[12] *See CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011).

For these reasons, Defendant's motion to dismiss based on lack of personal jurisdiction is **DENIED.**

---

[12] To the extent specific jurisdiction is appropriate as to any one of Plaintiffs' claims, the Court notes that it would exercise pendent personal jurisdiction over the remaining claims because all claims arise out of the same "common nucleus of operative facts." *See Picot*, 780 F.3d at 1211 (citation omitted).

**B.**    **Defendant's Motion to Dismiss under Rule 12(b)(3) and Forum Non Conveniens**

**1.**    **Legal Standards**

A defendant may move to dismiss a case for improper venue.  *See* Fed. R. Civ. P. 12(b)(3).  If venue is improper, the court may either dismiss the case without prejudice, or, if it is in the "interest of justice," may transfer the case "to any district or division in which it could have been brought."  28 U.S.C. § 1406(a); *see In re Hall, Bayoutree Assocs.*, 939 F.2d 802, 804 (9th Cir. 1991) (dismissal must be without prejudice).

After a defendant challenges venue, it is the plaintiff's burden to show venue is proper.  *See Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979).  When a motion to enforce a forum selection clause is made pursuant to Rule 12(b)(3), the court need not accept the allegations in the complaint as true, and may consider facts outside the pleadings.  *See Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004).  However, a court "must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party."  *Id.* at 1138.

Where, as here, the defendant contends the forum-selection clause points to a *foreign* forum, though, the appropriate way to enforce that clause is through the doctrine of forum non conveniens.  *See Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Texas*, 571 U.S. 49, 60 (2013).  A district court will typically

consider private and public interests when evaluating a forum non conveniens motion.[13]  *See id.* at 62–63.  The calculus changes if the parties' contract contains a valid forum selection clause.  *See id.*  In that case, the plaintiff's choice of forum merits no weight, arguments about the parties' private interests are not considered, and only arguments about public interests are considered.  *See id.* at 62–65.  The practical result is that a valid forum-selection clause should control except in unusual cases.  *See id.*

Defendant's motion appears to argue both that (1) the action should be dismissed under Rule 12(b)(3) because venue is improper under the plain terms of 28 U.S.C. § 1391(b); and (2) dismissal is also warranted under the doctrine of forum non conveniens because the action is governed by a forum-selection clause mandating that suit be brought in New Zealand.  The Court addresses each argument in turn.

---

[13]  Factors relating to the parties' private interests include relative ease of access to evidence; ability to compel unwilling witnesses to testify and the cost of enabling willing witnesses to testify; the possibility of viewing a premises if doing so is appropriate; and other practical concerns related to trying a case expeditiously and inexpensively.  *See Atl. Marine*, 571 U.S. at 62 n.6.  Public-interest factors may include issues of court congestion; the interest in having localized controversies decided at home; and the interest in having a case tried in a locality familiar with the law.  *See id.*  Some weight must also be given to a plaintiff's choice of forum. *See id.*

## 2. Venue Is Proper under 28 U.S.C. § 1391(b)

Defendant's argument that venue is improper because the Court lacks personal jurisdiction over him fails the reasons discussed above. Thus, venue would be appropriate, at the least, under § 1391(b)(3). But venue is also appropriate under § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in Hawaiʻi, namely Defendant's alleged misrepresentations regarding the mortgage on and transferability of the Property, as well as Defendant's alleged failure to provide certain information to Plaintiffs in Hawaiʻi as promised, all of which harmed Plaintiffs in Hawaiʻi. *See Myers v. Bennett Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2001) (noting that the locus of injury is a relevant factor for venue purposes and concluding venue was proper where plaintiffs felt the harms they suffered); *see also Servco Pac., Inc. v. SkyBridge Glob., Inc.*, CIVIL NO. 16-00266 DKW-KSC, 2016 WL 6996987, at *4 (D. Haw. Nov. 29, 2016) (concluding venue was proper given that defendant made certain misrepresentations to plaintiff in Hawaiʻi and performed certain contested services for benefit of plaintiff's Hawaiʻi operations).[14]

For these reasons, Defendant's motion to dismiss under Rule 12(b)(3) for improper venue is **DENIED.**

---

[14] Although neither party addresses it, venue also appears to be appropriate under the Securities Act. *See* 15 U.S.C. § 78aa(a) (stating venue is appropriate where defendant transacts business).

### 3. Defendant Has Not Met His Burden of Demonstrating Dismissal Is Appropriate under Forum Non Conveniens

Defendant's request to dismiss under forum non conveniens rests on his conclusory argument that a binding forum selection clause points to New Zealand as the only appropriate forum. First, Defendant failed to respond to Plaintiffs' argument that, because Plaintiffs are not suing him for breaching these agreements, any forum-selection clauses in those agreements have no effect here. Instead, at the hearing, Defendant argued—without citation to authority—that because the parties here entered into contracts, any forum-selection clauses in those contracts would govern even if Plaintiffs bring only tort claims. Regardless, Defendant's argument fails because the forum-selection clauses he points to are permissive rather than mandatory.[15]

Generally, permissive forum selection clauses are distinguished from those that are mandatory. In the former, the parties agree that jurisdiction and venue would be proper in a particular forum; in the latter, they agree that suit is proper *only* in that forum. *Compare Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 76–78 (9th Cir. 1987) (concluding that clause stating "[t]he courts of California, County of Orange, shall have jurisdiction over the parties" permitted suit to be filed there and meant defendant could not object to suit being filed there,

---

[15] At the hearing, counsel for Defendant essentially conceded that the clauses are permissive.

but did not mandate suit could only be filed there), *and N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1036–37 (9th Cir. 1995) (concluding that clause stating that arbitrator's decision "shall be enforceable . . . in the Superior Court of the City and County of San Francisco, State of California" meant parties consented to jurisdiction and venue there, but did not forbid litigation elsewhere because it did not clearly require exclusive jurisdiction there), *with Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 763–64 (9th Cir. 1989) (concluding that clause stating that plaintiff "agrees and consents to the jurisdiction of the courts of the State of Virginia" mandated suit must be heard in state court in Virginia based on additional clause stating that "[v]enue of any action . . . shall be deemed to be in Gloucester County, Virginia").

The forum-selection clauses here state: "the parties submit to the *nonexclusive* jurisdiction of the New Zealand Courts." ECF No. 13-3 ¶ 13(b) (emphasis added); *see also* ECF No. 15 § 19.14 (same).[16] These clauses plainly permit suit to be filed in New Zealand, but do not mandate New Zealand as the

---

[16] Defendant points to an agreement executed in July 2018; however, that agreement does not contain a forum-selection clause and instead states only: "[t]his Agreement will be governed by and construed in accordance with the laws of New Zealand." ECF No. 13-5 ¶ 5.10. While Defendant also references the HMA, he does not cite to (and the Court cannot locate) any forum-selection clause in that agreement. *See* ECF No. 13-6.

only appropriate forum "because [they] do[] not contain language 'clearly requir[ing] *exclusive* jurisdiction.'"[17] *N. Cal. Dist. Council of Laborers*, 69 F.3d at 1037 (quoting *Hunt Wesson*, 817 F.2d at 77) (final alteration in original) (emphasis added); *see also Haw. Island Air, Inc. v. Merlot Aero Ltd.*, Civ. No. 14–00466 BMK, 2015 WL 675512, at *7 (D. Haw. Jan. 30, 2015) (finding a clause identical to the clauses here to be permissive); *Cummins-Allison Corp. v. SBM Co.*, CIVIL NO. 12-00207 HG KSC, 2013 WL 12198835, at *11 (D. Haw. Jan. 28, 2013) (same).

Because Defendant incorrectly presumed that this action was governed by a binding, mandatory forum-selection clause, he failed to offer any argument or evidence that the private interest factors weigh in favor of dismissal and that the public and private interests together outweigh the deference to Plaintiffs' choice of a domestic forum. ECF No. 13-1 at 12–18; ECF No. 18 at 6–7. But an analysis of the private and public factors must clearly overcome the deference given to a plaintiff's choice of a forum in the United States, *see Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1449 (9th Cir. 1990), and forum non

---

[17] At the hearing, Defendant's counsel also belatedly referenced certain dispute resolution provisions. *See, e.g.*, ECF No. 13-3 ¶ 4. Because Defendant raised this argument for the first time at the hearing, the Court deems it waived. *See Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016). Even if considered, the Court is not persuaded that these provisions constitute mandatory forum-selection clauses.

conveniens is "an exceptional tool to be employed sparingly," *Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000), such that the Court cannot entertain this remedy in the absence of facts and argument presented in support of *all* relevant considerations. Without any argument to the contrary, the Court adopts Plaintiffs' arguments that the private interest factors counsel against dismissal. *See* ECF No. 17 at 17–21. Moreover, the Court is not persuaded by Defendant's arguments on the public interest factors. For example, Hawaiʻi residents *do* have an interest in a dispute involving a non-citizen allegedly misleading resident entities. And Defendant has not sufficiently explained why New Zealand law governs Plaintiffs' tort claims.

For these reasons, the Court **DENIES** Defendant's motion to dismiss on the basis of forum non conveniens.

## C. Defendant's Motion to Dismiss under Rule 12(b)(6)

Defendant also moves to dismiss under Rule 12(b)(6) for failure to state a claim, arguing that Plaintiffs failed to plead fraud and misrepresentation with the level of particularity required under Rule 9, and that Plaintiffs failed to plead the necessary elements of a civil RICO violation. ECF No. 13-1 at 18–25. In response, Plaintiffs represent that the exhibits attached to their opposition offer further factual development, that they have learned additional information from a shareholder of GAIL and will seek leave to file a Second Amended Complaint to

supplement their allegations and to delete any claims against GAIL.  ECF No. 17 at 21–23.  In reply, Defendant raises a *new* argument to support dismissal of Plaintiffs' securities claims, arguing that Plaintiffs failed to allege the creation of a security.  ECF No. 18 at 7–9.

The Court notes that the parties failed to file a statement confirming that they engaged in a meaningful pre-filing conference as required under Local Rule 7.8—which may have otherwise narrowed the issues raised herein under Rule 12(b)(6).  In light of this, and in light of the facts detailed above, the Court determines that considerations of efficiency and judicial economy favor denying Defendant's motion under Rule 12(b)(6) at this time, permitting Plaintiffs to file the appropriate motion to seek leave to file a Second Amended Complaint, and reminding the parties of their obligations under the Local Rules to meet and confer—preferably in person—before filing future motions.  Because Plaintiffs are sophisticated entities and represented by counsel, the Court further cautions that, should Defendant file a motion to dismiss any Second Amended Complaint, Plaintiffs will be deemed to be on notice of any alleged deficiencies raised in Defendant's present motion for purposes of addressing whether the Court should grant Plaintiffs additional chances to amend.

For these reasons, the Court **DENIES** Defendant's motion to dismiss under Rule 12(b)(6) on the condition that Plaintiffs are **ORDERED** to file an appropriate motion seeking leave to file a Second Amended Complaint by January 17, 2020.

### III.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion and **ORDERS** Plaintiffs to seek leave to file a Second Amended Complaint by January 17, 2020.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, January 3, 2020.

Jill A. Otake
United States District Judge

Civil No. 19-00079 JAO-KJM, *Greys Avenue Partners, LLC, et al. v. Colin Theyers, et al.*, ORDER DENYING DEFENDANT'S MOTION TO DISMISS

28